1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   RONALD HITTLE,                          No. 2:12-cv-00766-TLN-KJN

12              Plaintiff,

13        v.                                 ORDER

14   CITY OF STOCKTON, et al.,

15              Defendants.

16

17        This matter is before the Court pursuant to Defendants' Motion to Dismiss.  (ECF No.

18   39.)  Plaintiff Ronald Hittle ("Plaintiff") opposes the motion.  (ECF No. 41.)[1]  The Court has

19   carefully considered the arguments raised by the parties.  For the reasons set forth below, the

20   Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

21        **I.     INTRODUCTION AND PROCEDURAL BACKGROUND**

22        This civil rights action arises out of the allegedly unlawful termination of Plaintiff, the

23   former Fire Chief of the City of Stockton.  Plaintiff is suing the City of Stockton, Robert Deis,

24   and Laurie Montes.  Throughout this Order the Court will refer to them collectively as

25   "Defendants."  Defendant Deis is being sued in his official capacity as City Manager for the City

26   of Stockton, as well as in his individual capacity.  (First Am. Compl. ("FAC"), ECF No. 37 at ¶

27   _____
     [1]      Without explanation, Plaintiff seems to have filed two identical copies of the same brief on the same day.
28   (*Compare* ECF No. 40 *with* ECF No. 41.)  For ease of reference, all references in this Order will be made to the later-
     docketed filing.

                                              1

3.)  Likewise, Defendant Montes is being sued in her official capacity as Deputy City Manager for the City of Stockton, as well as in her individual capacity.  (ECF No. 37 at ¶ 4.)  Plaintiff's original complaint (ECF No. 1), which contained nine causes of action, was dismissed with leave to amend.  ("The Prior Order," ECF No. 34.)  Plaintiff subsequently filed the operative complaint, the FAC, where he reasserted all but his ninth cause of action from the original complaint.  (ECF No. 37.)

## II.  FACTUAL BACKGROUND[2]

In March 1987, Plaintiff began working for the City of Stockton Fire Department as a firefighter.  (ECF No. 37 at ¶ 9.)  Over the years, he rose through the Department to attain the rank of Chief.  (ECF No. 37 at ¶ 9.)

On or about July 9, 2010, Plaintiff had an introductory meeting with Defendant Deis, the newly appointed City Manager for the City of Stockton.  (ECF No. 37 at ¶ 10.)  Defendant Deis asked Plaintiff for his personal background, whereupon Plaintiff remarked that he was a devout Christian and that his religion instilled in him strong values of honesty and integrity.  (ECF No. 37 at ¶ 10.)  Defendant Deis cut Plaintiff off and changed the subject.  (ECF No. 37 at ¶ 10.)

In mid-2010, Defendant Montes, the Deputy City Manager for the City of Stockton, told Plaintiff that he and his staff members needed to improve their leadership skills, and that they should attend leadership training.  (ECF No. 37 at ¶ 11.)  Heeding Defendant Montes's advice, on August 5 and 16, 2010, Hittle and three fellow Stockton Fire Department officers — Matt Duaime, Paul Willette, and Jonathan Smith — attended a Christian-affiliated leadership seminar in Livermore, California called the Willow Creek Global Leadership Summit.  (ECF No. 37 at ¶ 12.)  The men paid the attendance fee out of their own funds, and dressed in plain clothes when attending.  (ECF No. 37 at ¶ 12.)  The other officers share a common bond, Christian fellowship.

---

[2]  The facts are taken from the FAC.  *See Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1142–43 (9th Cir. 2012) ("In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff.").  It is sometimes possible to summarize the factual allegations in a complaint without fear of losing a plaintiff's intended meaning.  For reasons not worth belaboring, it is not possible to do so here.  Consequently, aside from identifying the parties as "Plaintiff" or "Defendant," the Court has reproduced the allegations from the FAC verbatim in the order they appear in the FAC.  As it will serve no practical purpose, the Court declines to present the entire section in block quotation form, peppered with insertions of "[sic]."

(ECF No. 37 at ¶ 12.)

At all times Plaintiff was a devout Christian who would frequently share his faith with anyone he could, including Defendants Deis and Montes. (ECF No. 37 at ¶ 13.) Plaintiff believed that by attending a leadership conference like the Willow Creek Global Summit, he would satisfy the City's requirement that he improve his leadership skills, while at the same time doing so in a manner consistent with his religious beliefs, i.e. Christian Values are great leadership values. (ECF No. 37 at ¶ 13.) Before he was fired, Plaintiff explained this to the City which fired him nevertheless, and put it in writing in an August 24, 2011 "Notice of Intent to Terminate Employment." (ECF No. 37 at ¶ 13.)

In or about September 2010, an anonymous letter was sent to City Hall stating Plaintiff held a property interest in a cabin retreat along with other firefighters and Dave Macedo, President of the International Association of Firefighters Local 456. (ECF No. 37 at ¶ 14.) Soon thereafter, a highly negative article was printed in the Stockton Record, which claimed that Plaintiff was so close to the union as to cloud his professional judgment. (ECF No. 37 at ¶ 14.)

In fact, Plaintiff and Macedo had kept property interests in a cabin in Dorrington, California for five years, along with Matt Duaime (Battalion Chief, Stockton F.D.), Al Anton (Captain, retired, Stockton F.D.), and the men's wives. (ECF No. 37 at ¶ 15.) Nevertheless, it was common practice among senior Fire Department officers and police department managers and the Chief to pool their resources to purchase real estate, boats, etc. and those persons were not fired for their association with one another as was Plaintiff. (ECF No. 37 at ¶ 15.)

At the time of purchase, Plaintiff held the title of Deputy Chief; and Macedo held the title of Captain and was not yet president of the firefighters' union. (ECF No. 37 at ¶ 16.) However, after he became President of the firefighters union, Plaintiff's association with Macedo is protected since it its illegal under state and federal law to punish and or retaliate against workers for advocating for union rights. (ECF No. 37 at ¶ 16.) Plaintiff felt this association, even after Macedo became president of the union, furthered the City's interests by his having a good social and working relationship with Macedo. (ECF No. 37 at ¶ 16.) However Defendant Deis was angry with Plaintiff for his association with Macedo because, at this time, the City was in a fight

with the union over closure of a station house, and Measure H that would remove union members' right to binding arbitration of disputes and would weaken protection for Fire Department managers by stripping Civil Service Protection from them.  (ECF No. 37 at ¶ 16.) Furthermore, weeks before Plaintiff attended the Willow Creek Global Leadership Summit, Defendant Montes recited rumors to Plaintiff that Plaintiff had organized a "Christian coalition" within the ranks of the Fire Department, and that this was improper.  (ECF No. 37 at ¶ 16.) Plaintiff protested to her stating that there was nothing wrong with this group and that the City can't tell him not to do it.  (ECF No. 37 at ¶ 16.)  Defendant Montes brought this up to Plaintiff at least twice and he protested the same way each time.  (ECF No. 37 at ¶ 16.)

In or about October of 2010, Defendant Montes told Plaintiff that she was aware that he had attended a Christian-affiliated seminar and that was unacceptable for him to have done so despite his telling her that it was consistent with his faith and attended by secular and religious leaders from private and public sector.  (ECF No. 37 at ¶ 17.)  Plaintiff protested this, saying that he attended a leadership seminar at Defendant Montes's behest, that it was highly beneficial for his professional development, and that it did not matter that the seminar was Christian in its character; the focus of the seminar was leadership development, albeit Christian based.  (ECF No. 37 at ¶ 18.)

Soon thereafter, on or about November 1, 2010, Plaintiff was summoned to the office of the City Manager, Defendant Deis.  (ECF No. 37 at ¶ 19.)  With Defendant Montes also present, Defendant Deis presented Plaintiff with a list of approximately ten alleged violations of City policy, including Plaintiff's attendance at a religious-themed seminar, his permitting subordinates to attend the seminar with him, and his co-ownership of the cabin retreat.  (ECF No. 37 at ¶ 19.) Defendant Deis told Plaintiff that unless he accepted a demotion to Battalion Chief, he would be investigated for these purported violations.  (ECF No. 37 at ¶ 19.)  Defendant Deis even threatened Plaintiff, saying words to the effect of "I'll drag your name through the mud," "the investigation will be embarrassing for you and your family," and "you will probably win in a long, expensive legal battle, but your reputation will suffer irreparable harm."  (ECF No. 37 at ¶ 19.)  Further, Defendant Montes indicated that even if Plaintiff did accept the demotion, the

alleged violations would remain in his file and so could be used against him later.  (ECF No. 37 at ¶ 19.)  Plaintiff protested this proposed action by Defendant Deis as being illegal religious and association discrimination and refused to accept the lower position.  (ECF No. 37 at ¶ 19.)

In or around March of 2011, another negative article appeared in the Stockton Record, this time criticizing Plaintiff for his attendance at the Willow Creek Summit.  (ECF No. 37 at ¶ 20.)  On or about March 31, 2011, Plaintiff was placed on paid administrative leave while the allegations against him were, at the instigation of Defendant Deis and/or Defendant Montes, investigated.  (ECF No. 37 at ¶ 21.)

Over the course of two days in April of 2011, Plaintiff was interviewed at great length by an investigator, acting on behalf of the City, by the name of Trudy Largent.  (ECF No. 37 at ¶ 22.)  Largent interrogated Plaintiff on the subjects of the seminar, his personal religious beliefs and those of the other firefighters who attended the seminar, his property interest in the Dorrington cabin, and his hiring of a consultant, George Liepart, with whom Plaintiff was engaged in a project to build a church school.  (ECF No. 37 at ¶ 22.)  Plaintiff and Liepart share a common bond, namely Christian brotherhood and spent much time praying together for the success for church school.  (ECF No. 37 at ¶ 22.)  Additionally, although Plaintiff, at Largent's request, provided names of persons who could substantiate his own testimony, none of those persons were ever contacted.  (ECF No. 37 at ¶ 22.)

At no time did the City of Stockton inform Plaintiff that attending a Christian Leadership Conference with other Fire Managers would subject him to termination and the City never attempted to accommodate Plaintiff by discussing with him alternatives to attending.  (ECF No. 37 at ¶ 23.)  Moreover the contract with Liepart was approved by the then City Manager and City Council with advice from the City's attorney's office and with full knowledge of Plaintiff's relationship with Liepart.  (ECF No. 37 at ¶ 23.)  Moreover, the contract was long since completed in 2008.  (ECF No. 37 at ¶ 23.)

In addition, Plaintiff protested his association with Leipart and Macedo as being in violation of his rights.  (ECF No. 37 at ¶ 24.)  Liepart started working for the City fire department prior to Plaintiff becoming the fire chief.  (ECF No. 37 at ¶ 24.)  Chief Gillis hired Liepart

1  directly as a Department head this contract was within his contract authority.  (ECF No. 37 at ¶

2  24.)  Liepart was hired to work with administration and Union to bring trust back into the

3  organization.  (ECF No. 37 at ¶ 24.)

4  Plaintiff was appointed Chief in March of 2006.  (ECF No. 37 at ¶ 25.)  The City wanted

5  to continue with Liepart's work so Plaintiff had to take it to the city council for approval in June

6  of 2006.  (ECF No. 37 at ¶ 25.)  This was a consent council item that night and one of the council

7  members pulled it to ask Plaintiff questions about Liepart's performance.  (ECF No. 37 at ¶ 25.)

8  It passed unanimously.  (ECF No. 37 at ¶ 25.)  The Church school (VCMS) that the discharge

9  letter speaks about started in fall of 2004, well before Plaintiff was the Fire Chief.  (ECF No. 37

10  at ¶ 25.)  Plaintiff was not in any financial business activity during his time as Chief.  (ECF No.

11  37 at ¶ 25.)

12  The charge against Plaintiff contained in the August 24, 2011 letter of "Intent to Remove

13  From City Service" that he failed to investigate Liepart's fundraising efforts is false.  (ECF No.

14  37 at ¶ 26.)  An internal investigation was conducted after being ordered by Plaintiff and the

15  result of the investigation was inconclusive.  (ECF No. 37 at ¶ 26.)  Moreover, the City alleged in

16  its letter of "Intent to Remove From City Service," dated August 24, 2011, that this violated the

17  City policy against "conduct adverse to the welfare and/or good reputation of the City."  (ECF

18  No. 37 at ¶ 26.)  In fact, no such policy existed and Defendants Deis and Montes knew it when

19  Plaintiff was terminated.  (ECF No. 37 at ¶ 26.)

20  That same letter that Plaintiff received was signed by Defendant Deis.  (ECF No. 37 at ¶

21  27.)  This letter admits that he was being fired him for his attendance at a "Christian" leadership

22  seminar entitled "Global Leadership Summit."  (ECF No. 37 at ¶ 27.)  However, many

23  government leaders and private business men and women attend this seminar each year.  (ECF

24  No. 37 at ¶ 27.)  In addition, the policy procedures allegedly violated by Plaintiff, City Manager

25  Directive FIN-08 and Article C Section 11 of the Fire Department's Procedure Manual, were in

26  fact not violated by Plaintiff and Defendants Deis and Montes knew it but fired him anyway.

27  (ECF No. 37 at ¶ 27.)

28  The other eight reasons for terminating Plaintiff are either disguises for the real illegal

reasons or are simply too vague for understanding or simply not true.  (ECF No. 37 at ¶ 28.)

The City of Stockton regularly supports the annual "San Joaquin County Prayer Leadership Breakfast" that has been held at its city-owned Civic Auditorium which is, and has been, attended regularly by top City Officials, including but not limited to police and firefighters in uniform none of whom were terminated for their attendance.  (ECF No. 37 at ¶ 29.)

On or about October 3, 2011, Plaintiff's employment with the City was terminated.  (ECF No. 37 at ¶ 30.)  On February 29, 2012, Plaintiff presented a claim with the City in compliance with the Government Claims Act.  (ECF No. 37 at ¶ 30.)  On information and belief, Plaintiff alleges that the claim has or will be rejected or deemed rejected by operation of law.  (ECF No. 37 at ¶ 31.)  Accordingly, on or about February 29, 2012, Plaintiff filed a complaint with the Department of Fair Employment and Housing ("DFEH") against the City of Stockton, alleging religious discrimination, association discrimination, harassment, retaliation, failure to prevent discrimination or retaliation, and termination.  (ECF No. 37 at ¶ 32.)  Plaintiff received a right to sue notice from the DFEH that same day and served it on the City Clerk by fax.  (ECF No. 37 at ¶ 32.)  Additionally, on March 1, 2012, Plaintiff filed a complaint with the federal Equal Employment Opportunity Commission ("EEOC").  (ECF No. 37 at ¶ 32.)  The EEOC has issued a right to sue notice.  (ECF No. 37 at ¶ 33.)

### III.    STANDARD OF LAW

A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). A court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963). A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570). Only where a plaintiff fails to "nudge[ ] [his or her] claims ... across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Id*. at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

In ruling upon a motion to dismiss, the court may consider only the complaint, any

exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile). Although a district court should freely give leave to amend when justice so requires under Federal Rule of Civil Procedure 15(a)(2), "the court's discretion to deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint[.]" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

IV. **ANALYSIS**

The FAC sets out the following eight causes of action: (1) religious discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a), against the City of Stockton; (2) religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), against the City of Stockton; (3) association discrimination in violation of FEHA, Cal. Gov't Code § 12940(a), against the City of Stockton; (4) association discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City of Stockton; (5) retaliation in violation of FEHA, Cal. Gov't Code § 12945(h), against the City of Stockton; (6) retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), against the City of Stockton; (7) failure to prevent discrimination and retaliation in violation of FEHA, Cal. Gov't Code § 12940(k), against the City of Stockton; and (8) violation of constitutional rights, pursuant to 42 U.S.C. § 1983, against Defendants Deis and Montes. (ECF No. 37.)

9

Defendants move to dismiss each of the causes of action in the FAC pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  (ECF No. 39.)  With respect to the Eighth Cause of Action, Defendants contend that Defendants Deis and Montes are entitled to qualified immunity.  (ECF No. 39.)  The Court will address the causes of action in order.  The Court will analyze Plaintiff's religious discrimination claims together due to the similarities of Title VII and FEHA.  The Court will do the same with respect to Plaintiff's association discrimination claims.  The Court will likewise analyze Plaintiff's retaliation claims together.  However, before analyzing the parties' arguments, the Court will first discuss the interplay between the elements of a *prima facie* case under the so-called *McDonnell Douglas* burden-shifting framework and Rule 8(a), as relevant to motions to dismiss brought pursuant to Rule 12(b)(6).

A.  The *McDonnell Douglas Prima Facie* Case at Pleading Stage

The reason the Court will address this issue at length is two-fold.  First, in the Prior Order, the Court erroneously suggested Plaintiff was required to "allege the . . . elements" of "a *prima facie* case of religious discrimination on a failure to accommodate theory" to survive a Rule 12(b)(6) motion.  (ECF No. 34 at 7.)  Second, Defendants now erroneously argue that Plaintiff is required to do so in order to "sufficiently plead religious discrimination under a disparate treatment theory" or under a failure to accommodate theory.  (*See, e.g.*, 39-1 at 5–7.) Consequently, it is necessary for the Court to correctly set out the law on these points here.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), was the "first in a series of cases dealing with the difficulties of proving intent to discriminate in a disparate treatment context."  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th Cir. 2002) (en banc).  There, "[t]he Supreme Court detailed circumstances sufficient to support an inference of discrimination, the now-eponymous *McDonnell Douglas* '*prima facie* case and burden-shifting paradigm.'"  *Id*. "This legal proof structure is a tool to assist plaintiffs at the summary judgment stage so that they may reach trial."  *Id*. at 855.  "It is important to emphasize, however, that nothing compels the parties to invoke the *McDonnell Douglas* presumption."  *Id*.

In general, the *McDonnell Douglas* burden-shifting framework operates as follows: First,

10

the plaintiff must establish a *prima facie* case of discrimination.  *Pinder v. Employment Dev. Dep't*, 227 F. Supp. 3d 1123, 1137 (E.D. Cal. 2017).  The Supreme Court has made clear "the precise requirements of a *prima facie* case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic."  *Costa*, 299 F.3d at 854 (internal quotation marks omitted).  By way of illustration, using a disparate treatment theory of liability for a discrimination claim, a plaintiff "may establish a *prima facie* case by showing: (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive."  *Pinder*, 227 F. Supp. 3d at 1137 (internal quotation marks omitted).  "Often the fourth element is stated as 'similarly situated individuals outside his protected class were treated more favorably' or words to similar effect."  *Id*.  "Once established, the *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against the employee."  *Id*. (internal quotation marks omitted).  "This shifts the burden of production, but not persuasion, . . . to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Id*.  "If the defendant meets this burden of production, any presumption that the defendant discriminated drops from the case."  *Id*. at 1138 (internal quotation marks omitted).  "At this point, plaintiff must be given the opportunity to demonstrate that the proffered reason or reasons were pretext for intentional discrimination."  *Id*.

*Swierkiewicz* squarely "present[ed] the question whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a *prima facie* case of discrimination under the framework set forth by [the Supreme] Court in *McDonnell Douglas*[.]" *Swierkiewicz*, 534 U.S. at 508.  The Supreme Court unanimously held the answer was no.  "[A]n employment discrimination complaint need not include such facts and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).  There, the Supreme Court explained "[t]he *prima facie* case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."  *Id*. at 510.  Simply put, "under a notice pleading system, it is not appropriate to require a plaintiff to plead

facts establishing a *prima facie* case[.]" *Id*. at 511.

While *Swierkiewicz* was decided before *Iqbal* and *Twombly*, with respect to a claim to which the *McDonnell Douglas* framework is applicable, it remains the law that a plaintiff "is *not required* to plead a *prima facie* case of discrimination in order to survive a motion to dismiss." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012) (emphasis retained); *see generally Maduka v. Sunrise Hosp.*, 375 F.3d 909, 912 (9th Cir. 2004) (making clear that the reasoning of *Swierkiewicz* "applies to any claim to which the *McDonnell Douglas* framework is applicable"). That being said, nothing prohibits a plaintiff from attempting to plausibly plead a *prima facie* case under the *McDonnell Douglas* framework. *See Sheppard*, 694 F.3d at 1050 n.2. Doing so will ordinarily be enough to survive a Rule 12(b)(6) motion. *Id*. With this in mind, the Court will now address the parties' arguments with respect to Plaintiff's religious discrimination claims.

### B. First and Second Causes of Action: Religious Discrimination

"A claim for religious discrimination . . . can be asserted under several different theories[.]" *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).) A complaint must "give the defendant fair notice of what the claim is . . . and the grounds upon which it rests" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555 (original alteration omitted). Thus, if a defendant, after reading a complaint, cannot know what theory (or theories) of liability he is being sued under, that defendant has not been provided the requisite notice. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (explaining that "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations" and further explaining that different theories of liability for discrimination claims require the defendant to martial different evidence in its defense).[3]

---

[3] As is evident from Section IV.B.i of this Order, the Supreme Court's recent decision in *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015), acknowledges that it raises more questions than it answers regarding "failure to accommodate" claims and their relationship with disparate treatment claims. The take away point seems to be that, under Title VII, a "failure to accommodate" claim is a sub-species of "disparate treatment." It nevertheless remains that an employer may escape liability by martialing evidence for a "failure to accommodate" claim that would not help in an ordinary disparate treatment claim. *See id*. at 2032 n.1 (noting "the accommodation requirement" is not "absolute"). To avoid confusion, the Court will refer to "disparate treatment" and "failure to accommodate" each as a "theory of liability," as the parties have done so. Continuing to use these labels will have no practical effect on the outcome of the instant motion.

The original complaint failed to disclose which theory (or theories) of liability Plaintiff wished to pursue for his religious discrimination claims.  (*See* ECF No. 34 at 7 n.4.)  The Prior Order identified this as a deficiency requiring dismissal.[4]  (ECF No. 34 at 7 n.4.)  It is apparent that Plaintiff still fails to do this in the FAC.  While Plaintiff indicates in his opposition that he would like to proceed with his religious discrimination claims against the City of Stockton under both a failure to accommodate theory and a disparate treatment theory (ECF No. 41 at 3–4), this cannot cure this deficiency.  *See Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")  Accordingly, the Court again concludes Plaintiff's First and Second Causes of Action must be dismissed.

Thus, the question is whether dismissal of Plaintiff's First and Second Causes of Action should be with leave to amend and, if so, whether Plaintiff should be permitted to pursue both disparate treatment and failure to accommodate as theories of liability in his second amended complaint.  Before proceeding, the Court will set out the text of the relevant portions of FEHA and Title VII.

### i.     Text of Relevant Portions of FEHA and Title VII

With exceptions not relevant here, FEHA makes it an "unlawful employment practice . . . [f]or an employer, because of the . . . religious creed . . . of any person . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."  Cal. Gov't Code § 12940(a).  *Separately*, again with exceptions not relevant here, FEHA makes it an

> "unlawful employment practice . . . to discharge a person from employment . . . or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, . . . but is unable to reasonably accommodate the religious belief or observance without undue hardship.

---

[4]     For this reason, the outcome of the Prior Order with respect to Plaintiff's religious discrimination claims would have been the same, notwithstanding the Court's misstatement with respect to the necessity of pleading the elements of a *prima facie* case under the *McDonnell Douglas* framework.

Cal. Gov't Code § 12940(l).

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1). "As originally enacted, Title VII . . . simply prohibited employment discrimination on the basis of religion. This prohibition clearly covered discrimination on the basis of religious *belief*; whether it protected employees' religious *practices* was less clear. To clarify the point, Congress amended Title VII in 1972 by adding a definition of religion." *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 613 (9th Cir. 1988) (emphasis retained). As used in § 2000e-2(a)(1), "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "The intent and effect of this definition was to make it an unlawful employment practice under [42 U.S.C. § 2000e-2(a)(1)] for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

However, as the Supreme Court has acknowledged, this is a "somewhat awkward[]" way to incorporate a "reasonable accommodation duty" into Title VII. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). More recently, the Supreme Court has indicated that "[i]t is significant that § 2000e–2(a)(1) does not impose a knowledge requirement," even with respect to so-called "failure to accommodate" claims. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.* ("*Abercrombie & Fitch*"), 135 S. Ct. 2028, 2032 (2015). "Instead, [this] intentional discrimination provision prohibits certain *motives*, regardless of the state of the actor's knowledge." *Id*. at 2033 (emphasis retained). "Thus, the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Id*. In a footnote, the Supreme Court raised — but declined to resolve — the

14

1    following issue:

2          While a knowledge requirement cannot be added to the motive
3          requirement, it is arguable that the motive requirement itself is not
      met unless the employer at least suspects that the practice in
4          question is a religious practice — i.e., that he cannot discriminate
      "because of" a "religious practice" unless he knows or suspects it to
5          be a religious practice.

6    *Id.* at 2033 n.3.

7                    ii.    *Disparate Treatment Theory*

8          The Court now turns to whether Plaintiff plausibly alleged that he was discharged from

9    his job and otherwise discriminated against *because of* his Christian faith, i.e., under a disparate

10   treatment theory of liability.  After carefully considering the parties' submissions and closely

11   reviewing the FAC, the Court concludes that he has.  The gravamen of the FAC as it relates to the

12   disparate treatment theory of liability is Plaintiff was threatened with demotion, investigated,

13   placed on administrative leave, and ultimately terminated *because of* his Christian faith, along

14   with other bases Plaintiff argues are improper.  Plaintiff alleges that the City Manager and Deputy

15   City Manager of the City of Stockton had it out for him.  The former, Defendant Deis, was

16   allegedly angry with Plaintiff because of Plaintiff's relationship with the president of the

17   firefighters' union, Dave Macedo.  It is reasonably inferred from the well-pleaded allegations in

18   the FAC that the latter, Defendant Montes, was allegedly motivated by Plaintiff's Christian faith.

19   Plaintiff alleges Defendants Deis and Montes proffered pretextual reasons for his termination to

20   disguise their true motivations, which they knew to be unlawful.  For the reasons given in the

21   accompanying footnote, the Court will set out in detail support for its conclusion that the

22   applicable standard has been met citing to the FAC.[5]

23   _____

24   [5]       The parties' submissions have focused  on whether certain elements of a *McDonnell Douglas prima facie*
     case are adequately plead.  An argument by a movant that a non-applicable legal standard is not met generally fails to
     meet the movant's burden "to prove that no legally cognizable claim for relief exists."  *See* 5B Charles A. Wright &
25   Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).  However, the Court is cognizant that this
     misplaced focus may have resulted (at least in part) from this Court's already-discussed misstatement of the law on a
26   related point in the Prior Order.  (*See* ECF No. 34 at 7.)  The Court "may dismiss a claim *sua sponte*" under Rule
     12(b)(6).  *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987).  Further, the Supreme Court has made
27   clear that the Court has the inherent power to "control the disposition of the causes on its docket with economy of
     time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).
     Consequently, in reaching its conclusion with respect to the disparate treatment theory of liability, the Court not only
28   considered the parties' arguments but conducted its own close review of the FAC against the applicable standard.

                                                    15

Plaintiff alleges he was invited to meet with Defendants Montes and Deis on approximately November 1, 2010, where they apparently laid out their plan to him. (ECF No. 37 at ¶ 19.) Here, he was allegedly explicitly told that he would be investigated for violations of policy unless he accepted a demotion. (ECF No. 37 at ¶ 19.) According to Plaintiff, Defendant Deis made clear the purpose of the investigation was to pressure him into accepting a demotion to avoid embarrassment and reputational damage. (ECF No. 37 at ¶ 19.) Defendant Deis apparently acknowledged what they were doing was unlawful, i.e., allegedly saying to Plaintiff "you will probably win in a long, expensive legal battle, but your reputation will suffer irreparable harm." (ECF No. 37 at ¶ 19.) Then, allegedly, Defendant Montes followed this up with her own threat to keep these allegations in his file so they could be used against him later, even if Plaintiff agreed to the demotion. (ECF No. 37 at ¶ 19.)

According to Plaintiff, he refused to accept demotion and explicitly told Defendants Montes and Deis their proposed action would constitute religious and association discrimination against him. (ECF No. 37 at ¶ 19.) A few months later, in approximately March 2011, a negative article was published about him in the Stockton Record criticizing his attendance at the Willow Creek Global Leadership Summit. (ECF No. 37 at ¶ 20.) Plaintiff alleges that an investigation, "instigated by [Defendant] Montes and/or Deis," followed on or about March 31, 2011. (ECF No. 37 at ¶ 21.) Ultimately, Plaintiff was terminated on October 3, 2011, after first receiving a letter, dated August 24, 2011, labeled "Intent to Remove from City Service," which the Court will refer to as the "Termination Letter." (ECF No. 37 at ¶¶ 26, 30.) This Termination Letter offered a number of bases for his termination. (*See, e.g.*, ECF No. 37 at ¶¶ 26–29.) Some Plaintiff describes as "simply too vague" to be comprehensible. (ECF No. 37 at ¶ 28.) The rest he contends are factually untrue, true but not violations of policy, violations of policy that are never the basis of termination, or some combination of the three. (*See, e.g.*, ECF No. 37 at ¶¶ 26–29.) For example, Plaintiff specifically notes that the Termination Letter "boldly admits that he was being fired for his attendance at a 'Christian' leadership seminar entitled 'Global Leadership Summit.'" (ECF No. 37 at ¶ 27.) Plaintiff, then, specifically alleges that "the policy procedures allegedly violated" by Plaintiff were "in fact not violated." (ECF No. 37 at ¶ 27.) Further,

Plaintiff alleges that Defendants Deis and Montes "knew [these policies were not violated by his attendance] but fired him anyway." (ECF No. 37 at ¶ 27.)

The reasonable inference — indeed, one that screams from the page — is that Defendants Deis and Montes followed through on their threats. The only real question is whether Plaintiff has pleaded factual content that allows the Court to draw the reasonable inference that Defendants were at least partially motivated to take adverse employment actions against him because of his Christian faith. *Abercrombie & Fitch*, 135 S. Ct. at 2032–33. Plainly he has. It is reasonably inferred from Plaintiff's well-pleaded allegations that Defendant Montes disapproved of Plaintiff's admitted involvement with a group of Christians within the Stockton Fire Department.[6] (*See, e.g.*, ECF No. 37 at ¶ 16.) Further, it is reasonably inferred from Plaintiff's well-pleaded allegations that Plaintiff's involvement with this group was not violative of any applicable policy. (*See, e.g.*, ECF No. 37 at ¶¶ 16, 26–29.) Finally, Plaintiff plausibly alleges that Defendant Montes took a leading role in a concerted effort to ouster him, a high ranking Christian municipal employee, through a campaign of threats, intimidation, and improper investigation, culminating with a termination on allegedly trumped up charges. In sum, but for his failure to indicate he was proceeding under a disparate treatment theory, as currently pleaded, the allegations in the FAC plausibly alleged Plaintiff was discriminated against *because of* his religion. Plaintiff simply needs to make clear in his second amended complaint that he is proceeding under this theory.

### iii. Failure to Accommodate Theory

The Court will now examine whether Plaintiff should be given leave to amend to pursue a religious discrimination claim proceeding on a failure to accommodate theory. That is, assuming the FAC had made clear that Plaintiff intended to pursue such a theory, have Defendants demonstrated there were other reasons for dismissing such a claim and, if so, could these

---

[6] While there is no need to belabor the point, the Court would simply observe the phrase Defendant Montes allegedly used — "Christian coalition" — is not a common expression. If meant literally, it would suggest anxiousness or annoyance that Christians are exerting too much power or influence in the City of Stockton's Fire Department, particularly given the allegations that this statement was followed in relatively short order by an attempt to ouster Plaintiff as Chief of that department on false pretenses. (*See, e.g.*, ECF No. 37 at ¶¶ 19, 26–29.) For that same reason, if Defendant Montes was referencing "[t]he Christian Coalition" associated with Pat Robertson, it is reasonably inferred that Defendant Montes as not expressing affection or admiration for that group or that she was otherwise positively disposed towards it. *See Fed. Election Comm'n v. Christian Coal.*, 52 F. Supp. 2d 45, 49 (D.D.C. 1999) (discussing the roots of that organization).

deficiencies be cured by additional factual allegations in a second amended complaint. *See Lopez*, 203 F.3d at 1130. Before proceeding, the Court will briefly summarize the parties' "failure to accommodate" arguments.

Defendants assert Plaintiff must allege facts establishing the following three elements in order to survive a Rule 12(b)(6) motion with respect to his failure to accommodate theory:

> "(1) he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed the employer of that belief and conflict; and (3) the employer threatened the employee with or subjected him to discriminatory treatment, including discharge, because of an inability to fulfill the job requirements."

(ECF No. 39-1 at 5 (citing *California Fair Employment & Hous. Comm'n v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1011 (2004) (discussing FEHA) and *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383 (9th Cir. 1984) (discussing Title VII).)

Applying this rule, Defendants offer four reasons they think Plaintiff's failure to accommodate claim should be dismissed. First, in a footnote, Defendants argue dismissal is proper because the FAC "does not allege that Defendants required [Plaintiff] to attend leadership training but merely [alleges Defendant] Montes told [him that he] *should* attend leadership training." (ECF No. 39-1 at 5 n.3 (emphasis retained) (internal quotation marks omitted).) Second, even if Plaintiff were required to attend such training, Defendants argue dismissal is proper because the FAC fails to "plead facts demonstrating an *actual conflict* between [Plaintiff's] religious beliefs and practice, and an employment requirement of the City" because Plaintiff does not allege that his "religious beliefs or practice required him to attend a Christian leadership conference instead of leadership training without a religious affiliation or component." (ECF No. 39-1 at 5 (emphasis retained).) Third, even if there were such a conflict, Defendants argue dismissal is proper because the FAC does not (i) allege that Plaintiff "informed [Defendants] of his need to attend a Christian leadership conference before he did so," (ii) "allege[] facts from which it could be inferred that Defendants had notice of the potential need for accommodation before [Plaintiff] attended the conference," or (iii) allege that he requested an accommodation. (ECF No. 39-1 at 6.) Fourth, again in a footnote, Defendants argue that even

had Plaintiff informed them in advance, they "were under no obligation to allow [Plaintiff] to attend the religious seminar as a reasonable accommodation." (ECF No. 39-1 at 6 n.4.)

In his opposition Plaintiff responds as follows: First, Plaintiff cites paragraph 23 of the FAC, which notes *he was never informed* in advance that his attendance at a Christian leadership conference would subject him to termination. (*See* ECF No. 41 at 3.) Second, his "attendance at the Christian Leadership conference [was specifically cited] as a substantial reason for his termination," along with an indication that his attendance "violated a specific City policy." (ECF No. 41 at 3.) Third, while Plaintiff does not think City policy *actually* prohibited his attendance, "if it did, [this would] derogate[] from his rights under FEHA [and] Title VII[.]" (ECF No. 41 at 3.) Fourth, "[t]here is no requirement that [Plaintiff] request accommodation of a religious practice in order to state a *prima facie* case for religious discrimination; it is enough that the employer is aware of the belief and the conflict." (ECF No. 41 at 4.) Fifth, "it is clear from the FAC that [Defendant] Montes confronted [Plaintiff] long before he attended the Global Leadership Summit about his 'Christian Coalition.' Nevertheless [the FAC] clearly shows that the City after being told they were discriminating against [Plaintiff] did nothing to engage in discussions regarding accommodations for [Plaintiff] and instead terminated him." (ECF No. 41 at 4 (internal citations omitted).)

Defendants contend Plaintiff's opposition demonstrates the FAC fails to plead facts to support the first two elements of a *prima facie* case for failure to accommodate claims under Title VII and FEHA. (ECF No. 44 at 2–3 (again citing *Gemini Aluminum* and *Bhatia*).) Furthermore, Defendants ask that Plaintiff not be given leave to amend with respect to this theory of liability. (ECF No. 44 at 8–9.)

As a general matter, movants in Rule 12(b)(6) motion have the burden to demonstrate that "no legally cognizable claim for relief exists." *See* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* ("Wright and Miller") § 1357 (3d ed. 2004). The motion with respect to this theory of liability is in an odd posture. As noted at the outset, Defendants have shown that Plaintiff's religious discrimination claim should be dismissed for failure to identify which theory (or theories) the FAC is pursuing. Aside from this flaw, Defendants have not

shown that no legally cognizable claim for relief exists with respect to Plaintiff's putative failure to accommodate theory. This is largely (if not exclusively) the consequence of Defendants' insistence that Plaintiff must adequately plead the elements of a *prima facie* case to survive a Rule 12(b)(6) motion. As explained below, Defendants have not shown this is required.

Neither of the cases Defendants cite, *Gemini Aluminum* and *Bhatia*, stand for the proposition that Plaintiff was required to plead in the FAC the three elements identified by Defendants. Indeed, neither case dealt with a motion applying the Rule 12(b)(6) standard. Neither case indicates these are the elements of a cause of action, as opposed to a *prima facie* case in a burden-shifting framework. In fact, they seem to suggest the latter. *Gemini Aluminum*, 122 Cal. App. 4th at 1011 ("Once the employee establishes a *prima facie* case with sufficient evidence of the three elements, the burden shifts to the employer to establish that it initiated good faith efforts to accommodate or no accommodation was possible without producing undue hardship.") (internal quotation marks omitted); *Bhatia*, 734 F.2d at 1383 (same). In any event, Ninth Circuit precedent has identified the burden-shifting framework employed in the failure to accommodate context as a subspecies of the *McDonnell Douglas prima facie* case analysis.[7] *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006). Given the similarities between FEHA and Title VII generally, along with the genesis of the statement in *Gemini Aluminum*, upon which Defendants rely, the Court assumes for purposes of this motion that California law takes the same view. *Gemini Aluminum*, 122 Cal. App. 4th at 1011 (citing *Soldinger v. Nw. Airlines, Inc.*, 51 Cal. App. 4th 345, 370 (1996), which cites *Heller*, 8 F.3d at 1438). Even if Defendants had demonstrated that the three elements they cite in their briefs *were* (at one time) the elements of a cause of action, as opposed to a burden shifting analysis, Defendants have not explained why this iteration of the elements remains good law after *Abercrombie & Fitch*. With respect to a motion to dismiss under Rule 12(b)(6), "[d]ismissal *can* be based on the lack of a cognizable legal theory

---

[7]     Candidly, the fit between the burden-shifting framework applicable in so-called failure to accommodate claims and the label *McDonnell Douglas* is not well explained in Ninth Circuit precedent. The Title VII test derived from *McDonnell Douglas* and its progeny (and adopted by California case law for FEHA) is often referred to as a "three-step burden-shifting test," *Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 920 (9th Cir. 2017), or a "three-step burden-shifting framework," *Schechner v. KPIX-TV*, 686 F.3d 1018, 1027 (9th Cir. 2012). California and Ninth Circuit precedent apply a "two-part framework" in reasonable accommodation claims. *See, e.g., Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993); *Gemini Aluminum*, 122 Cal. App. 4th at 1011.

or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (emphasis added). But it is *Defendants' burden* to show that dismissal is proper under this standard. Simply put, they have not done so here.

That being said, the Supreme Court has explained "accommodation," as used in the failure to accommodate context, "means nothing more than allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary[.]" *Abercrombie & Fitch*, 135 S. Ct. at 2032 n.2. Plaintiff's second amended complaint should at a minimum include the following two allegations, if he intends to pursue a failure to accommodate theory with respect to his attendance at the Willow Creek Global Leadership Summit. First, Plaintiff should allege whether he believed his attendance at this summit to be a religious practice or observance within *his understanding* of his faith. FEHA and Title VII broadly define religious practice, and American courts are loath to tell a person that his interpretation of his faith is a wrong one. *See, e.g.*, *Heller*, 8 F.3d at 1438 (explaining that a federal court's determination of "whether a particular practice is or is not required by the tenets of [a particular] religion . . . would be irreconcilable with the Supreme Court's warning in *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953), [that it] 'is not business of courts to say . . . what is a religious practice or activity.'") (internal alteration omitted). But it is important that Plaintiff understood himself to be engaged in a religious practice. Second, as it currently stands, Plaintiff alleges his attendance *does not* violate the policies identified in his Termination Letter. (ECF No. 37 at ¶ 27.) His opposition seems to go further, indicating that his attendance was not in conflict with any of his employer's policies. (ECF No. 41 at 3.) However, Plaintiff seems to indicate that, if his attendance did fall afoul of some policy or requirement, he could pursue a failure to accommodate claim in the alternative. (*See* ECF No. 41 at 3–4.) If that is Plaintiff's intention, he should plead in the alternative that his attendance did violate one (or more) of his employer's rules, policies, requirements, etc. Finally, it is plainly within Plaintiff's knowledge whether he informed his employer that he wanted (or needed) to attend the Willow Creek Global Leadership Summit. Plaintiff should allege whether he did and, if so, whether this came before or after he attended it.

///

C.  Third and Fourth Causes of Action: Association Discrimination

Defendants understand Plaintiff's Third and Fourth Causes of Action to relate to his associations with Dave Macedo and George Liepart.  (ECF No. 39-1 at 8.)  The Court will discuss them in that order.

It is Defendants' understanding that Plaintiff views his relationship with Dave Macedo as protected under FEHA and Title VII either because Mr. Macedo is a union official or because he is a union supporter.  (ECF No. 39-1 at 8.)  Defendants argue "the FAC fails to state a claim of discrimination under . . . FEHA or Title VII based on [Plaintiff's] association with Macedo" because "[n]either union officials nor union supporters are a protected class under either statute." (ECF No. 39-1 at 8.)  Plaintiff's opposition offers no response.  (*See* ECF No. 41.)  Consequently, Plaintiff concedes that he fails to state a claim with respect to his relationship with Dave Macedo. *See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011).

It is Defendant's understanding that Plaintiff views his relationship with Mr. Liepart as protected under FEHA and Title VII because Liepart, like Plaintiff, is Christian.  (ECF No. 39-1 at 8–9.)  Plaintiff does not dispute this.  (ECF No. 41 at 4.)  This Court held in its Prior Order as follows: Plaintiff's "association discrimination claim[s], to the extent it relates to Plaintiff's association with Liepart, is insuffient as alleged, because association discrimination claims are not tenable when based on a characteristic shared by the plaintiff and the person with whom he associates."  (ECF No. 34 at 9 (citing *Whitfield v. Trade Show Servs., Ltd.*, No. 2:10-CV-00905-LRH, 2012 WL 693569, at *3–4 (D. Nev. Mar. 1, 2012) (holding same-race association discrimination theory untenable).)  Plaintiff's curt response accuses Defendants of citing no authority in support of this Court's holding, despite the fact that Defendants do cite *Whitfield*. (*Compare* ECF No. 39-1 at 8–9 *with* ECF No. 41 at 4.)  Remarkably, Plaintiff completely ignores this Court's Prior Order.  Aside from the fact that Plaintiff has not moved for reconsideration of the Prior Order on this point, nothing in Plaintiff's opposition convinces the Court to revisit its prior holding.

As Plaintiff has given no indication whatsoever of any other associations that might

support his association discrimination claims, aside from the two just rejected as failing to state a claim, Plaintiff's Third and Fourth Causes of Action will be dismissed without leave to amend.

### D. Fifth and Sixth Causes of Action: Retaliation

The Court's discussion of Defendants' motion with respect to the Fifth and Sixth Causes of Action will necessarily be brief. The thrust is that Plaintiff does not adequately allege that he "opposed religious discrimination" prior to suffering an adverse employment action. (ECF No. 39-1 at 9–10.) In doing so, Defendants focus on four paragraphs from the FAC that they contend insufficiently allege such opposition. (ECF No. 39-1 at 9–10 (analyzing ECF No. 37 at ¶¶ 13, 16–18).) Glaringly, Defendants do not discuss paragraph 19 of the FAC which details the meeting where Defendants Montes and Deis allegedly threatened Plaintiff with investigation to prompt him into accepting a demotion. (*See* ECF No. 37 at ¶ 19.) The Court has already discussed in detail why it was reasonable to think this was motivated (at least in part) by Plaintiff's Christian faith. Paragraph 19 closes with the following sentence: "Hittle protested this proposed action [i.e., the plan] by [Defendant] Deis as being illegal religious and association discrimination and refused to accept the lower position." (ECF No. 37 at ¶ 19.) Defendants make no effort to explain why this is inadequate. Consequently, Defendants have not met their burden to show that dismissal of the Fifth and Sixth Causes of Action is appropriate.

### E. Seventh Cause of Action: Failure to Prevent Discrimination and Retaliation

Defendants argue that Plaintiff's Seventh Cause of Action for failure to prevent discrimination and retaliation must be dismissed because the FAC "does not state a plausible claim for discrimination or retaliation under any theory." (ECF No. 39-1 at 11.) However, as explained above, Defendants failed to demonstrate that Plaintiff's Fifth and Sixth Causes of Action fail to state a claim. Consequently, Defendants' argument in favor of granting their motion with respect to the Seventh Cause of Action must be rejected.

### F. Eighth Cause of Action: Violation of First Amendment

The Supreme Court's "decisions have referred to constitutionally protected 'freedom of association' in two distinct senses" — intimate associations and expressive associations. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984). The parties agree that Plaintiff's Eighth Cause of

Action deals with both types of associations. However, this requires some introduction for reasons that will become clear.

The parties agree that Plaintiff's Eighth Cause of Action is based on his associations with Dave Macedo and George Liepart. In their opening brief, Defendants assert that Plaintiff is contending that his relationship with Macedo is intimate and his association with Liepart is expressive. (ECF No. 39-1 at 11–12.) With respect to Macedo, Defendants suggest the question is whether either the "joint ownership of real estate" or ownership of a "cabin for recreation purposes" was protected by the First Amendment. (ECF No. 39-1 at 11–12.) In his opposition, Plaintiff takes the position Defendants are not fairly construing his allegations with respect to his relationships with either Macedo or Liepart. Plaintiff argues that the FAC alleged his associations with both men are intimate, while his association with Liepart is also expressive. (ECF No. 41 at 7–8.) With respect to Macedo, Plaintiff argues the FAC, fairly read, "allege[s] an association much deeper and more intimate than" Defendants describe. (ECF No. 41 at 8.) Plaintiff contends the allegations in the FAC show that his association with Macedo is part of a small "group of persons who chose to pool their finances and efforts to spend a significant portion of their lives in each other's company" and the two men are part of a friendship group that is "small, exclusive, and congenial." (ECF No. 41 at 8.) Defendants' reply seems to accept that the FAC could be read to allege an intimate relationship between Plaintiff and Liepart. (ECF No. 44 at 6.) Furthermore, Defendants do not quibble with Plaintiff's characterization of how the FAC might be read with respect to the level of intimacy in his relationship with Macedo. (ECF No. 44 at 6.)

In short, Defendants' reply accepts the FAC's allegations can hold the weight of Plaintiff's reframing. (*Compare* ECF No. 41 at 8 *with* ECF No. 44 at 6.) Consequently, the Court will accept that as well for purposes of resolving the instant motion. In essence, Defendants' opening brief *would have had* the Court answer the question whether either ownership of a cabin for recreational purposes or joint ownership of a real estate are sufficiently intimate to warrant constitutional protection. As reframed by the opposition and the reply, the question is whether an allegedly close personal friendship warrants constitutional protection.

This complicates matters as it relates to the arguments regarding intimate association. As

previously discussed, Defendants, as the movants, have the burden to demonstrate "no legally cognizable claim for relief exists." *See* 5B Wright & Miller § 1357. Ordinarily, this would present a problem as a "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Defendants essentially managed to dodge that problem by making virtually no effort to recalibrate their arguments from their opening brief in their reply. (*Compare* ECF No. 39-1 at 11–12 *with* ECF No. 44 at 6.) This presents an out-of-the-kettle-into-the-fire situation, as a district court is not "required to address perfunctory and undeveloped arguments[.]" *Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001). With this being said, the Court will turn to the parties' arguments. The Court will first address the parties' submissions with respect to intimate association, along with related qualified immunity arguments.

*i.* *Intimate Association*

With respect to intimate associations, the Supreme Court has explained that the United States Constitution "protects those relationships . . . that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte* ("*Duarte*"), 481 U.S. 537, 545 (1987) (quoting *Roberts*, 468 U.S. at 619–20). "Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620. At one end of the spectrum are relationships that the Supreme Court has made clear are entitled to constitutional protection: marriage; the begetting and bearing of children; child rearing and education; and cohabitation with relatives. *Duarte*, 481 U.S. at 545. The Supreme Court has also identified several associations that are not entitled to such protection. *See, e.g.*, *Roberts*, 468 U.S. at 612, 620–22 (membership in a "local chapter[] of the Jaycees," a "nonprofit membership corporation," which was "neither small nor selective" and "much of the activity central to the formation and maintenance of the association involve[d] the participation of strangers to that

relationship"); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (finding it "clear beyond cavil that dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of intimate human relationships referred to in *Roberts*") (internal quotation marks omitted). Further, the Supreme Court has explained there is no "generalized right of social association." *Stanglin*, 490 U.S. at 25 (internal quotation marks omitted). However, the Supreme Court has "not held that constitutional protection is restricted to relationships among family members." *Duarte*, 481 U.S. at 545.

Defendants have not identified any Supreme Court or Ninth Circuit precedent categorically excluding friendships from constitutional protection and the Court has located none. However, a cursory Westlaw search indicates the federal judiciary has been confronted in other cases with questions regarding whether personal friendships are constitutionally protected intimate associations in the nearly thirty years that has passed since *Stanglin*. Neither party has brought these to the Court's attention, let alone analyzed them.[8] Given the poverty of briefing on this point, the Court declines to definitively resolve whether Plaintiff's friendships with Macedo and Liepart are sufficiently intimate. Simply put, Defendants have not met their burden to demonstrate that Plaintiff fails to state a claim with respect to the Eighth Cause of Action as it relates to intimate associations.

That being said, assuming it were determined Plaintiff's associations with Macedo and Liepart are sufficiently intimate, the Court agrees that Defendants Montes and Deis are entitled to qualified immunity. Qualified immunity shields government actors in their individual capacities from monetary damages, even where their conduct is later found to be a constitutional violation, so long as the constitutional right in question was not clearly established at the time of the

---

[8]     In their opening brief, Defendants pin-cited the following parts of three cases: *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1996); *Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 550, fn. 4 (D.P.R. 1996); and *Burnett v. San Francisco Police Dept.*, 36 Cal. App. 4th 1177, 1188-89 (1995). (ECF No. 39-1 at 12.) They did so in support of the following proposition: "Courts have consistently held that association for recreational purposes is not sufficiently 'intimate' or 'expressive' to warrant First Amendment protection." (ECF No. 39-1 at 12.) This was done without offering any further legal analysis.
        When it came time for their reply, the same string citation (still without legal analysis) was offered in support of the same one-sentence proposition. (ECF No. 44 at 6 ("Courts have consistently held that association for recreational purposes is not sufficiently 'intimate' or 'expressive' to warrant First Amendment protection.").) None of these cases stand for the proposition that close personal friendships are insufficiently intimate to be afforded constitutional protection. Nor was the argument made that they do.

unconstitutional conduct. *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 961 (E.D. Cal. 2017). Assuming the relationships in question were sufficiently intimate, it cannot be said that such a right was clearly established at the time of the alleged misconduct, as neither the Ninth Circuit nor the Supreme Court has recognized a friendship, however close, as sufficiently intimate to warrant constitutional protection. Consequently, Plaintiff's Eighth Cause of Action is dismissed with prejudice insofar as it seeks money damages from Defendants Montes and Deis in their individual capacities for infringing upon Plaintiff's right to intimate association.

### ii.    Expressive Association

The Court will now turn to whether Plaintiff's Eighth Cause of Action should be dismissed insofar as it relies on the First Amendment's protection of expressive association. "[A] single association may have intimate and expressive features[.]" *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1192 (9th Cir. 1988). Defendants have not argued that Plaintiff's relationship with Liepart is insufficiently expressive. Instead, with little in the way of coherent explanation, Defendants' opening brief argues that Plaintiff cannot show this association was harmed. At the risk of stating the obvious, Plaintiff very clearly alleges he was *fired* for this association. It is hard to think of a more quintessential constitutional harm that a government employee might suffer than losing his job for engaging in conduct protected by the First Amendment. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977); *see generally Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412 (2016). Defendants' opening brief very clearly failed to meet their burden to show the FAC fails to state a claim for infringing upon Plaintiff's right to expressive association.[9]

The Court will very briefly address Defendants' qualified immunity argument as to expressive association. The Court finds that it cannot conclude that qualified immunity is appropriate at this stage in the proceedings. "Qualified immunity is an affirmative defense that

---

[9]     For the sake of completeness, the Court notes that Defendants' reply brief suggests that they were free to fire Plaintiff with impunity *in 2011* for his admittedly protected association because "the FAC does not allege [his] association [with Liepart] extended beyond 2009." (ECF No. 44 at 7.) Defendants cite no authority in support of this proposition or otherwise coherently explain why this might be. In any event, as previously noted, the Court "need not consider arguments raised for the first time in a reply brief." *Zamani*, 491 F.3d at 997. Likewise, the Court is not "required to address perfunctory and undeveloped arguments[.]" *Williams*, 190 F. Supp. 2d at 1114. The Court is not inclined to do so here.

must be raised by a defendant." *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001). Therefore, dismissal under Rule 12(b)(6), "is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies." *Id.* Defendants' qualified immunity argument is premised on the Court accepting *their factual assertions* regarding the true reasons for Plaintiff's termination. (ECF No. at 39-1 at 14.) At this stage in the proceedings, it is *Plaintiff's* factual allegations that are taken as true and it is *he* who is to be given the benefit of every reasonable inference from his well-pleaded factual allegations. Accordingly, Defendants' qualified immunity argument must be rejected.

## V.   CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1. With respect to the First and Second Causes of Action, the Motion to Dismiss is GRANTED, with leave to amend;

2. With respect to the Third and Fourth Causes of Action, the Motion to Dismiss is GRANTED, without leave to amend;

3. Defendants' Motion to Dismiss is DENIED with respect to Plaintiff's Fifth, Sixth, and Seventh Causes of Action;

4. Defendants' Motion to Dismiss is DENIED with respect to Plaintiff's Eighth Cause of Action, except that the Court finds Defendants Montes and Deis, in their individual capacity, are entitled to qualified immunity as set forth above in connection with their alleged infringement on Plaintiff's right to intimate association; and

5. Plaintiff may file a second amended complaint in conformity with this Order within 30 days of the date this Order is filed.

IT IS SO ORDERED.

Dated: March 16, 2018

Troy L. Nunley
United States District Judge