**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONALD HITTLE, | No. 22-15485 |
| *Plaintiff-Appellant*, | D.C. No. 2:12-cv-00766-TLN-KJN |
| v. | |
| CITY OF STOCKTON, California; ROBERT DEIS; LAURIE MONTES, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Judge, Presiding

Argued and Submitted March 27, 2023
San Francisco, California

Filed August 4, 2023

Before: Ronald M. Gould and Sandra S. Ikuta, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Korman

---

[*] The Honorable Edward R. Korman, United States District Judge for the
Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

The panel affirmed the district court's summary judgment in favor of defendants in Ronald Hittle's employment discrimination action under Title VII and California's Fair Employment and Housing Act.

Hittle alleged that he was terminated from his position as Fire Chief for the City of Stockton based upon his religion and, specifically, his attendance a religious leadership event.

The panel held that, in analyzing employment discrimination claims under Title VII and the California FEHA, the court may use the *McDonnell Douglas* burden-shifting framework, under which the plaintiff must establish a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged actions. Finally, the burden returns to the plaintiff to show that the proffered nondiscriminatory reason is pretextual. Alternatively, the plaintiff may prevail on summary judgment by showing direct or circumstantial evidence of discrimination. Hittle was required to show that his religion was "a motivating factor" in defendants' decision to fire him with respect to his federal claims, and that his religion was "a substantial motivating factor" with respect to his FEHA claims.

The panel concluded that Hittle failed to present sufficient direct evidence of discriminatory animus in

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

defendants' statements and the City's notice of intent to remove him from City service. And Hittle also failed to present sufficient specific and substantial circumstantial evidence of religious animus by defendants. The district court's grant of summary judgment in defendants' favor was appropriate where defendants' legitimate, non-discriminatory reasons for firing Hittle were sufficient to rebut his evidence of discrimination, and he failed to persuasively argue that these non-discriminatory reasons were pretextual.

---

## COUNSEL

Elisabeth C. Butler (argued) and Aaron M. Streett, Baker Botts LLP, Houston, Texas; Kelly J. Shackelford, Jeffrey C. Mateer, and David J. Hacker, First Liberty Institute, Plano, Texas; Stephanie N. Taub, First Liberty Institute, Cabot, Arizona; Kayla A. Toney, First Liberty Institute, Washington, D.C.; Alan J. Reinach and Jonathon Cherne, Church State Council, Westlake Village, California; for Plaintiff-Appellant.

Spencer J. Wilson (argued), Arthur A. Hartinger, Ryan P. McGinley-Stempel, and Geoffrey Spellberg, Renne Public Law Group, San Francisco, California, for Defendants-Appellees.

David H. Thompson and Joseph O. Masterman, Cooper and Kirk PLLC, Washington, D.C., for Amicus Curiae Global Leadership Network.

Sue Ghosh Stricklett, American Hindu Coalition, Sterling, Virginia; Nicholas M. Bruno, Charles R. Flores, Alyssa B. McDaniel, Zachary T. Nelson, Beck Redden LLP, Houston,

Texas; for Amici Curiae Sikh Coalition, Asma Uddin, Jewish Coalition for Religious Liberty, American Hindu Coalition, and Coalition for Jewish Values.

---

## OPINION

KORMAN, District Judge:

Plaintiff-Appellant Ronald Hittle ("Hittle") was an at-will employee of the City of Stockton, California (the "City") and served as the City's Fire Chief from 2005 through 2011.  During his tenure, Hittle engaged in conduct that troubled his employer, and led ultimately to his termination.   The City hired an outside independent investigator, Trudy Largent ("Largent"), to investigate various allegations of misconduct.  In a 250-page report referencing over 50 exhibits, Largent sustained almost all of the allegations of misconduct against Hittle.

Largent's Report specifically concluded that Hittle: (1) lacked effectiveness and judgment in his ongoing leadership of the Fire Department; (2) used City time and a City vehicle to attend a religious event, and approved on-duty attendance of other Fire Department managers to do the same; (3) failed to properly report his time off; (4) engaged in potential favoritism of certain Fire Department employees based on a financial conflict of interest not disclosed to the City; (5) endorsed a private consultant's business in violation of City policy; and (6) had potentially conflicting loyalties in his management role and responsibilities, including Hittle's relationship with the head of the local firefighters' union. Based on the independent findings and conclusions set forth

in Largent's report, the City removed Hittle from his position as Fire Chief.

Hittle sued the City, former City Manager Robert Deis ("Deis"), and former Deputy City Manager Laurie Montes ("Montes") (jointly, "Defendants") claiming that his termination was in fact the result of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and California's Fair Employment and Housing Act ("FEHA"). Hittle alleged that Deis and Montes terminated his employment as Fire Chief "based upon his religion." Specifically, Hittle alleges that he was fired for attending a religious leadership event.

On February 18, 2021, Defendants moved for summary judgment seeking dismissal of all of Hittle's claims. Hittle subsequently cross-moved for partial summary judgment as to his federal and state religious discrimination claims on April 1, 2021. On March 1, 2022, the district court denied Hittle's motion and granted Defendants' motion as to all of Hittle's claims. Hittle timely appealed.

## BACKGROUND

In deciding a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Here, we recite the facts in the light most favorable to Hittle. Hittle was the Fire Chief of the Stockton Fire Department during the period relevant to this appeal. In that capacity, Hittle initially reported directly to Gordon Palmer, Stockton's City Manager. After Palmer retired in 2009, Hittle began reporting directly to Montes, who had been appointed Deputy City Manager in 2008.

In May 2010, the City received an anonymous letter purporting to be from an employee of the Stockton Fire Department.  The letter described Hittle as a "corrupt, racist, lying, religious fanatic who should not be allowed to continue as the Fire Chief of Stockton."  In her subsequent affidavit in support of her motion for summary judgment, Montes stated that the source of this information was not an anonymous individual but a high-ranking Fire Department manager, who had told her that "Hittle favored members of that coalition—who all shared his Christian faith," and that her concern was that "Hittle was providing favorable treatment and assignments" to these other employees.  About one month after the City received this letter, Montes told Hittle in a meeting that she had "heard [he] was part of a group of folks, a Christian Coalition, and that [he] shouldn't be involved in that."  When Hittle stated that "[a]s a supervisor, you can't tell me I can't practice my faith when I'm off duty," Montes asked him about his "off duty Christian activities."  Hittle told her that "there was no Christian clique within the fire department that was meeting together, nor did she have any right to tell [Hittle] what [he] could or could not do with respect to [his] religion while off duty."  According to Hittle, during this conversation, Montes said that Hittle should not "be a part of anything like that as the fire chief, and [he] should refrain from doing any of those types of activities" with other firefighters.  Montes did not specifically explain what "those type of activities" comprised, but Hittle thought "the inference was the fact that I may have meetings with them, I might pray with them, I may have opportunity to speak to them about God, leadership in that respect."  Hittle and Montes are in apparent agreement that Montes did not initiate the "Christian Coalition" term herself.

On July 1, 2020, Bob Deis became City Manager.  At Hittle's and Deis's first meeting, Hittle expressed to Deis that he is "a religious man" and that he is "a Christian."  Deis responded with "a blank stare, and there was a long pause." Deis's "body language and stare made [Hittle] very uncomfortable."   Hittle felt that Deis's "coldness and rejection" was because Hittle had expressed that he was a Christian, and that Deis had heard about the anonymous letter and the "Christian Coalition."  Hittle had the "distinct impression" that Deis's "mind was already made up about" Hittle.

In her oversight of Hittle, Montes became concerned about Hittle's performance as Fire Chief in other ways unrelated to Hittle's alleged religious favoritism. Specifically, Montes claimed that Hittle worked against the City's plans to cut public budget costs and expenses, unlike all of the other City Department heads during that time who were cooperating with the City Manager's office in an ultimately unsuccessful effort to avoid the City declaring bankruptcy.  As another example, in 2010, a proposition referred to as "Measure H" was slated for the ballot that November.  Some members of the City's Fire Department opposed Measure H because they believed that it would undermine Fire Department autonomy and authority.   In response, several off-duty firefighters visited nursing homes wearing their on-duty Fire Department clothing and told the residents that Measure H, if passed, would prevent the Fire Department from providing timely services to seniors in the event of an emergency.  When the City Manager's office received complaints about on-duty firefighters advocating against Measure H, Deis and Montes raised the issue with Hittle.  Montes claimed that Hittle agreed that the conduct was not acceptable but did not make an effort to stop it from

occurring. Hittle disputes this allegation, and states that "Local 456 owned an antique fire engine that displayed a banner: 'Stockton Professional Firefighters,'" which had been used for many years for campaigning off-duty prior to the termination of Hittle, with no objection from management. The union used the antique fire truck without objection from Human Resources, Deis, or Montes for holidays and community events for many years and Hittle had not been disciplined for the union using the antique fire truck on off-duty time until 2010, when it was raised by Deis and Montes for the first time.

In light of these and other issues, including what Deis believed was Hittle's failure to "assure that proper decorum and ethical parameters were in place and enforced in his Department," Deis instructed Montes to continue directly supervising Hittle.

According to Montes, during the fall of 2010, due to what she "believed was a clear lack of leadership and management skills displayed by Chief Hittle," Montes directed Hittle "to find and attend a leadership training program." Montes states that she specifically directed Hittle to "find a program intended for Fire Chiefs, or at least designed for the upper management of public entities," and was clear to Hittle that she wanted the leadership training to be related specifically to public sector service. Montes claims that she suggested to Hittle that the League of California Cities may provide such training, and that she was aware that the Federal Bureau of Investigation and the Post Officers Standards and Training offered upper management training programs to police departments through that group. Hittle stated that he reviewed various leadership training programs, but was unable to find any that were in California, or at a cost that the Fire Department could afford. Hittle

subsequently was gifted four tickets to an event called the Global Leadership Summit (the "Summit"). The Summit was sponsored by a church, and its registration materials stated that: "The leadership summit exists to transform Christian leaders around the world with an injection of vision, skill Development and inspiration for the sake of the LOCAL CHURCH." However, according to a magazine article in the record, the Summit is a "pop-up business school" that "bring[s] a stellar faculty . . . to teach pastors and laypeople leadership and management." The Summit had "over 60,000 leaders . . . gather" and was "broadcast live . . . to more than 225 satellite sites across North America." Previous "speakers includ[ed] former President Bill Clinton, former Secretary of State Colin Powell, Jack Welch, and Carly Fiorina, former CEO of Hewitt-Packard." The same magazine referred to the Summit as "learning from the business world's best." Hittle explained that his "purpose in attending the leadership conference was to learn leadership principles and enhance leadership skills that would assist [him] to lead the" fire department. Hittle also states that there was no policy that prohibited employees from attending religious programs while on duty. Along with three fellow firefighters, Hittle traveled in a City vehicle to Livermore, California to attend the Summit on August 5 and 6, 2010.

On September 3, 2010, the City received a second anonymous letter stating that Hittle and other fire department personnel had "attended a religious function on city time" using "a city vehicle." Deis asked Montes to evaluate the issues raised in the letter. According to Largent, Deis's "concern[] about Hittle attending this event on City time [was] that 'you cannot use public funds to attend religious

events; even if under the guise of leadership development.  It is not acceptable.'"

When Montes asked Hittle about the allegations in the second letter, Montes alleges that Hittle confirmed that he had attended the Summit on City time, accompanied by three City firefighters, that they used a City vehicle to travel to the Summit, and that they were paid their regular compensation during their attendance.    Montes states that Hittle "continually insisted that although this Willow Creek Summit did contain a religious component, there were several business oriented non-religious speakers," and that he "defended his conduct claiming that this was appropriate leadership training."

Later, in a meeting with Hittle, Montes "again brought up the subject of there being a Christian Coalition in [Hittle's] department, and that these are the people [he] associate[s] with."  Montes "told [Hittle] this wasn't good, and that [he] should not be doing this."  She also told him he should not have attended the leadership training.  Hittle told Montes that the leadership training was the best he had ever attended, "there[ was] no Christian Coalition," and "she could not tell me I can't practice my religious faith, or with whom to associate."  Hittle "asserted [his] right to associate with other Christians and told [Montes] she had no right to tell [him] what [he] could do on [his] own time to practice [his] faith."  Hittle stated that Montes "raised her voice when accusing [him] of taking part in a Christian Coalition," and "[w]hen the term [']Christian Coalition['] was used by [Montes], it was clear [Montes] was saying it in a pejorative way, making it clear this was wrong and distasteful to her."  "Montes did not accept [Hittle's] explanation" and continued to ask about Hittle's "religious activities including

the [Summit]." This is the principal basis for Hittle's challenge to the adverse action against him.

Subsequently, on October 15, 2010, the Stockton Record reported that Hittle co-owned a vacation property with the Firefighters' Union President Dave Macedo ("Macedo"), Fire Marshal Matthew Duaime ("Duaime"), and retired Fire Captain Allen Anton. Montes claims that she learned of the conflict only after the newspaper article was published because Hittle had not previously disclosed this joint ownership to City officials. In Montes's view, this co-ownership raised questions about Hittle's impartiality with respect to "balancing the interests of the union and the taxpayers."

Montes issued a notice of a confidential investigation to Hittle on November 1, 2010 (identifying five issues) because of her perception that Hittle had "issues of non-cooperation and poor management practices." Montes stated that even after she issued the notice of investigation, Hittle continued to engage in conduct that she found troubling. For example, Macedo (president of the fire department union) admitted to providing Health Insurance Portability and Accountability Act (HIPAA) protected information to the media in an attempt to influence San Joaquin County to permit City firefighters to provide advanced life support at emergency scenes. Montes claims that Hittle imposed only minor discipline on Macedo and defended Macedo's conduct, despite the fact that the leak resulted in the County suing the City and obtaining a preliminary injunction.

Montes also discovered that Duaime had falsified his time records in two ways. First, he had attended the Summit with Hittle. Second, he would work overtime and not submit a request for the incurred compensation, instead "saving"

that time and improperly submitting a request for compensation on a day on which he had not worked overtime.    Hittle defended Duaime's practices in a memorandum to Montes dated March 14, 2011, stating that Duaime had worked all the hours submitted, and had held accrued time off the books in order to avoid charging the City overtime.    Montes alleges that Hittle refused to discipline Duaime until ordered to do so.

In addition, at this time, the City was in the midst of a fiscal crisis and on the verge of declaring bankruptcy, and Deis and Montes "instructed all Department Heads to prepare layoff plans in order to reduce costs which could potentially help avoid the bankruptcy."    According to Montes, all Department Heads complied with this order except Hittle, who informed Montes that he could not agree to any layoffs or recommend a cut in staffing.  As a result of Hittle's failure to follow this directive, Deis and Montes placed Hittle on administrative leave pending the outcome of the investigation that had been initiated the previous November.

On March 25, 2011, the City retained Trudy Largent, an outside investigator with human resources experience, to investigate Hittle's conduct.  Largent interrogated Hittle at length regarding his Christianity and about the Summit. According to Hittle, the investigation was one-sided, because Largent did not investigate the nature of the leadership training provided by the Summit or contact the witnesses identified by Hittle.  Hittle claims that Largent's "demeanor and approach clearly communicated her lack of impartiality."

On August 5, 2011, Largent submitted to the City her Confidential Investigation Report (the "Largent Report"),

which totaled over 250 pages and referenced more than 50 exhibits.   In Largent's interview with Montes, Montes negatively referred to Christians.   Montes stated: "Incidentally when I told [Hittle] to go get some leadership training he asked if he [c]ould use George Liepart and I told him no, he's one of the church clique, and I said you know we need to get away from . . . you know going, going around the same mountain all the time."   The Largent Report characterized Hittle's "use of City time and a City vehicle to attend a religious event" as the first "most serious act[] of misconduct."   The Largent Report repeated the term "religious event" over 15 times, and stated that "it [was] clear that the primary mission of the Global Leadership Summit was to specifically provide for the benefit of those of a particular religion, Christianity."   Indeed, the Largent Report makes clear that one of the key issues of the Fire Department's investigation was on "[w]hether the Global Leadership Summit was a religious event," and dedicated five pages to discussing its religious nature.   In these pages, the Largent Report concluded that when Hittle "arrived at the Summit location . . . and observed where it was being held [(a church)] this should have alerted Hittle that his participation and that of his managers would not be appropriate."

In the investigation of whether Hittle engaged in misconduct and violated City policy or Fire Department Procedures, the Largent Report made the following findings (in summary) as to each issue, and determined whether the City's allegations were sustained or not sustained:

> 1. The lack of effectiveness of Chief Hittle's ongoing supervision and leadership of the Fire Department, judgment as a department

head, and his contributions to the management team; **"Sustained."**

2. Chief Hittle's failure to maintain proper discipline and order within the Department, contributing to a delay in investigating potential misconduct is **"Not Sustained."** The allegation that Hittle has delayed in making recommendations as to appropriate level of discipline; **"Sustained in part and Not Sustained in part."**

3. Use of City time and City vehicle by Chief Hittle to attend a religious event; his failure to properly report time off, and Hittle potentially approving on-duty attendance at a religious event by Fire Department managers; **"Sustained."**

4. Potential favoritism of employees by Chief Hittle and conflict of interest based on financial interest not disclosed to the City; **"Sustained."**

5. Apparent endorsement of [a] private consultant's business by Chief Hittle as an official of the City and potential conflict of interest by Hittle not disclosed to the City; **"Sustained."**

6. Failure by Chief Hittle to comply with management directions and his capability in respect to budget development; **["]Not Sustained."**

7. Potentially conflicting loyalties by Chief Hittle in his management role, responsibilities, and his relationship with

>           the   Firefighters   Local   456   Union;
>           **"Sustained."**

After reviewing the Largent Report, Deis and Montes concluded that Chief Hittle should be removed from his position.   In particular, Montes was concerned about the various findings that were sustained against Hittle in the Largent Report, and she and Deis did not believe that Hittle had provided them with any indication that he would attempt to correct his behavior or improve his management skills. Deis and Montes met with Hittle and offered to appoint Hittle to a Battalion Chief position so that he could remain at the fire department until he reached the retirement age of 50, to which he was relatively close at that time.   Hittle did not accept this offer, and informed Deis and Montes that he intended to retain counsel and bring a lawsuit.   Hittle stated that "Deis got very angry," "raising his voice and threaten[ing]" that if Hittle did not accept a demotion, he would face "a long expensive legal battle," and his "reputation would suffer irreparable harm."

On August 24, 2011, the City sent Hittle a notice of its intent to remove him from City service (the "Removal Notice") for the reasons stated in the Largent Report, which was attached, and which included the following detailed descriptions of its findings:

> 1)  On August 5 and 6, 2010, you used City time and resources to attend a religious leadership event. This conduct violated City Manager Directive   No.   FIN-08   and Article C, Section 11 of the Fire Department Procedures Manual.

2)  On August 5 and 6, 2010, you approved the attendance on City time of Deputy Chief Paul Willette, Division Chief Matt Duaime, and Fire Marshal Jonathan Smith at the same religious leadership event. This conduct violated City Manager Directive No. FIN-08 and Article C, Section 11 of the Fire Department Procedures Manual.

3)  From 2004 through 2008, the City retained Integrated Services Group to provide consulting services to the fire department. At no time did you disclose to the City your personal relationship with the firm's owner, George Liepart, or the fact that the two of you were engaged in a project to build a church school. Nor did you properly investigate complaints that in 2005 Liepart solicited donations from fire department employees for the church school project. This conduct violated City policy against conduct adverse to the welfare and/or good reputation of the City.

4)  Despite receiving information in 2009 that the Integrated Services Group website contained an endorsement by you under a photograph of you in your Fire Chief uniform, you failed to investigate whether the information was true. This tacit endorsement of Liepart's firm violated City policy against conduct adverse to the welfare and/or good reputation of the City.

5)  You failed to disclose to the City that you co-owned a cabin with Captain Dave Macedo, also President of International Association of Firefighters Local 456 (Union), and Division Chief Duaime. This violated your duty as a department head to disclose any actual or potential conflict of interest. Furthermore, this relationship raises questions as to why you failed to investigate Duaime's improper reporting of compensatory time on his timesheets for May and August 2010.

6)  On March 29 and 30, 2011, you presented Deputy City Manager Laurie Montes with a Union proposal to put firefighters on a leave of absence instead of laying them off. This conduct was contrary to a department head's duty to further the goals and policies of the City.

7)  Your failure to recommend appropriate discipline for misconduct by Captains Tony Moudakis [for authorizing on-duty firefighters to assist his wife with a personal matter] and John Loverin [for falsifying dates on the Department's official pay records] violated Article 3, section 9 of the Fire Department Rules and Regulations, which requires you to "see that proper discipline is maintained."

8)  After the Union released confidential patient information to the media in 2007, you failed to address the issue with employees to

prevent a recurrence. When confidential patient information was again released by the Union on September 9, 2010 you failed to address preventative measures with employees. This conduct violated Article 3, section 9 of the Fire Department Rules and Regulations.

9) Between July 13, 2010 and October 2010 you failed to prevent members of the public from perceiving that firefighters were engaged in Union activities while on-duty. These activities included: wearing Union t-shirts that closely resembled official City firefighter shirts while riding on a fire engine owned by the Union; using City equipment to clean the Union hall while on-duty; and asking permission for on-duty personnel to set up for a Union-sponsored retirement dinner. This conduct raises doubts about your ability to be an effective department head and to further the goals and policies of the City.

10)   In the fall of 2010, you told Fire Department Internal Affairs Investigator Mark Lujan that firefighters were "upset" with him for displaying a "Yes on Measure H" sign on his lawn. This conduct raises doubts about your ability to be an effective department head and to further the goals and policies of the City.

The City provided Hittle the opportunity to meet with a City official and respond to the notice of intent to terminate. On September 28, 2011, Hittle, joined by his attorney, met

with then-Deputy City Manager Michael Locke and Assistant City Attorney Michael Roush.   During that meeting, Hittle's attorney argued that the investigative report was not objective and that the meeting did not comport with due process.   Hittle claims that the hearing was a sham, because he was not given an opportunity to call witnesses or obtain evidence and was locked out of his email system and files, and so had no opportunity to meaningfully defend himself.   According to Locke, neither Hittle nor his attorney "provided any substantive reasons why [Hittle] should not be removed as Fire Chief."   Following the meeting, Locke sent a memo to Deis stating that, based on his review of the Largent Report and its findings, and because Hittle had not refuted any of the findings, Locke recommended that Hittle be removed as Fire Chief.   On September 30, 2011, the City sent Hittle a formal notice of separation from City service, removing Hittle from his position as Fire Chief effective as of October 3, 2011.

## STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   We review grants of summary judgment *de novo*.   *Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021).   Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1113 (9th Cir. 2022).

## DISCUSSION

We analyze employment discrimination claims under Title VII and the California FEHA using the *McDonnell Douglas Corp. v. Green* burden-shifting test. *See* 411 U.S. 792 (1973); *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145 (9th Cir. 2017) ("Because state and federal employment discrimination laws are similar, California courts apply the *McDonnell Douglas* burden-shifting framework to analyze disparate treatment claims under FEHA."). Under this framework, a plaintiff alleging that an employer engaged in discriminatory conduct adversely affecting plaintiff's employment must establish a *prima facie* case by demonstrating that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). A plaintiff may demonstrate an inference of discrimination "through comparison to similarly situated individuals, *or* any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (emphasis added) (internal quotation marks omitted). Similarly, California courts applying this test in the FEHA context have characterized the fourth element as a showing that "some other circumstance suggests discriminatory motive." *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 355 (2000).

Should the plaintiff set forth a *prima facie* case, the burden shifts to the defendant to articulate "a legitimate,

nondiscriminatory reason for the challenged actions." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021). If the defendant does so, the burden "returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual." *Id*. A plaintiff meets his or her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Alternatively, a plaintiff can prevail merely by showing direct or circumstantial evidence of discrimination; he or she does not need to use the *McDonell Douglas* framework. *See McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1122 (9th Cir. 2004) (holding that a plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employer). Under Title VII, the plaintiff need only "demonstrate[] that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the [unlawful employment] practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Thus, Hittle must demonstrate that his religion was "a motivating factor" in Defendants' decision to fire him with respect to his federal claims, *see id*., and that his religion was "a substantial motivating factor" for his firing with respect to his FEHA claims, *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013).

**1**

On summary judgment, direct evidence of discrimination is that which, "if believed, proves the fact [of

discriminatory animus] without inference or presumption." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). We have concluded that derogatory comments made by a decisionmaker are "direct evidence of . . . discriminatory animus" and "can create an inference of discriminatory motive." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997). Chief among Hittle's examples of direct evidence of discriminatory animus is Montes's reference to Hittle being part of a "Christian coalition," and Montes's and Deis's statements that Hittle was part of a "church clique" in the Fire Department. Montes responds to this characterization by noting that a high-ranking Fire Department manager had complained to her that there was a "Christian coalition" within the Fire Department, and that Hittle improperly favored members of that so-called coalition. Hittle acknowledged that the term "Christian coalition" came from the anonymous letters sent to the City criticizing Hittle's management of the Fire Department, and not from Montes herself.

Montes's comments—whether taken in the context of one conversation with Hittle or during Hittle's tenure as Fire Chief as a whole—do not constitute discriminatory animus. As previously observed, Hittle and Montes are in apparent agreement that Montes did not initiate the "Christian coalition" term herself, and that it originated from other members of the Fire Department who expressed unhappiness over Hittle allegedly engaging in favoritism. *Cf. Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (finding no direct evidence of animus where discriminatory remarks were attributed to a non-decisionmaker employee). Montes's repetition of other persons' use of pejorative terms does not provide evidence of Montes's own animus, but rather shows concerns about

other persons' perceptions.  *See id.*; *cf. Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998) (discussing that there is no direct evidence of animus if a remark would require an inference or presumption in an employee's favor).  And although Hittle suggests that Montes engaged in discrimination by informing him that the City was not "permitted to further religious activities" or "favor one religion over another," these observations do not constitute direct evidence of discrimination.  Rather, they reflect Montes's legitimate concern that the City could violate constitutional prohibitions and face liability if it is seen to engage in favoritism with certain employees because they happen to be members of a particular religion.  *See Noyes v. Kelly Servs.*, 488 F.3d 1163, 1172 (9th Cir. 2007) (concluding that a fact finder could reasonably determine that an employer engaged in discrimination by promoting employees because they were members of a certain religion).  In short, because Montes and Deis did not use derogatory terms to express their own views, or focus on the religious aspect of Hittle's misconduct to express their own animus, but rather referenced other legitimate constitutional and business concerns, their terminology does not give rise to a genuine issue of discriminatory animus.  *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085–86 (5th Cir. 1994) (per curiam) (indicating that where remarks had an innocent explanation, they were not evidence of gender discrimination).

Hittle also claims that the Removal Notice issued by the City demonstrates direct evidence of discrimination because of its repeated references to Hittle's attendance at a "religious event" (*i.e.*, the Summit) and his approval of other Fire Department employees to attend.  But this does not

suggest discrimination, because the undisputed record shows that the Removal Notice relied on the findings in the Largent Report, which concluded that Hittle engaged in misconduct by attending a two-day event that did not benefit the City because it was not the sort of leadership conference aimed at public sector leadership, all while on paid City time, and approving three others to do likewise. In other words, the references to Hittle's misconduct by attending the Summit are due to a legitimate non-discriminatory reason—lack of benefit to the City—rather than to religious animus. It is undisputed that the Summit, even if a "pop-up business school," did not constitute the type of upper management public sector leadership training that Montes directed Hittle to seek out, as it did not provide any focus on the management of public agencies. Montes and Deis could conclude (whether correctly or incorrectly) that the skills that the Summit sought to impart were not of any value or relevance to the three other firefighters whom Hittle invited to attend the event with him, all of whom also participated while on City time. Such a view is supported by the registration materials for the Summit, stating that the purpose of the leadership summit was to benefit the local church. An employer's conclusion that an activity does not benefit the employer is not discriminatory even if the activity has some relationship to a protected characteristic, such as religion or race. *See Davis*, 14 F.3d at 1085–86. "We cannot infer [religious] discrimination based on factual allegations that are 'just as much in line with' the non-discriminatory explanation we have identified." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276 (1st Cir. 2022) (citation omitted). Where there are "obvious alternative explanations for the purportedly unlawful conduct and the purposeful invidious discrimination plaintiff asks us to infer, discrimination is not

a plausible conclusion." *Id.* (cleaned up) (citation and internal quotations omitted).

Because the employer could discipline Hittle for attending an event of no benefit to the City (the "obvious alternative explanation" for identifying the Summit as problematic), the employer's discipline of two of the other Fire Department employees who attended the Summit with Hittle—both of whom were also Christian—by "forfeit[ing] two days of vacation to reimburse the City for the time spent attending the leadership conference," is also not discriminatory on the basis of religion.[1]  More important, Hittle did not point to similarly situated people who attended events of no benefit to the City who were not disciplined, and so did not establish that part of his prima facie case.

Finally, Hittle contends that Deis's declaration in support of Defendants' motion for summary judgment contains statements that are proof of Deis's animus towards Hittle's religion.  Deis describes Hittle's attendance at the Summit as exercising "poor judgment," and that Hittle engaged in an "inappropriate activity" that was simply "for [Hittle's] own personal interests."  But, as discussed above, Deis, like Montes, had legitimate, non-discriminatory reasons to be critical of Hittle inappropriately using City resources to attend an event for his personal benefit, and inviting other City personnel to do the same.[2]

---

[1] Paul Willette, the third member of the Fire Department to attend the Summit with Hittle, retired prior to the issuance of the Largent Report.

[2] Nor does Hittle provide evidence of discrimination—direct or otherwise—by describing a subjective and self-serving "long pause" and Deis's "blank stare" during their first meeting after Hittle mentioned to

Nothing in our case law compels a different result.  Hittle cites to *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005), *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1128 (9th Cir. 2000), and *Cordova*, 124 F.3d at 1149, in arguing that, in this Circuit, "a single discriminatory comment is sufficient to preclude summary judgment for the employer."  The decisionmakers in those cases made "clearly sexist, racist, or similarly discriminatory statements or actions by the employer" related to protected characteristics of the employee. *Coghlan,* 413 F.3d at 1095.  In *Dominguez-Curry*, plaintiff was told by a decisionmaker that "women have no business in construction," and that "women should only be in subservient positions," 424 F.3d at 1031; in *Chuang*, a decisionmaker remarked at a meeting that "'two Chinks' in the department were more than enough," 225 F.3d at 1121; and in *Cordova*, the decisionmaker referred to a non-plaintiff employee as a "dumb Mexican."  124 F.3d at 1147.  None of these cases are comparable to this case, where the decisionmaker was making what could only be described as reasonable inquiries based on allegations of misconduct that she had concededly received from others in language comparable to what they used.  We are not prepared to hold that such an inquiry constitutes evidence of direct discrimination specifically or discrimination generally.

Even if the quoted remarks are perceived as pejorative by Hittle, our precedent does not dictate a contrary result. The statements by Montes and Deis are more akin to "stray

---

Deis that he was a Christian.  *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) ("[I]solated incidents (unless extremely serious) will not amount to discriminat[ion]." (citation omitted)).

remarks that have been held insufficient to establish discrimination." *Cordova*, 124 F.3d at 1149. And this evidence falls within the ambit of circumstantial evidence that requires an additional logical leap that is not supported by the record here. *See Coghlan*, 413 F.3d at 1095-96 (discussing the difference between direct and circumstantial evidence, with circumstantial evidence requiring "specific and substantial" evidence to defeat summary judgment). Therefore, discriminatory remarks made by a decisionmaker must be "clearly sexist, racist, or similarly discriminatory" to create an inference of discriminatory motive. Here, the decisionmaker was merely conducting an inquiry based on complaints by third parties and the "obvious alternative explanation," *Frith*, 38 F.4th at 276, for using those pejorative terms was that the decisionmaker was quoting the third parties.

Finally, because neither Montes nor Deis made any remarks demonstrating their own hostility to religion, but focused on the Summit's lack of benefit to the City and other evidence of Hittle's misconduct, Hittle failed to demonstrate that hostility to religion was even a motivating factor in his termination.

**2**

On summary judgment, circumstantial evidence of discrimination "must be 'specific' and 'substantial.'" *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (citation omitted), *as amended on reh'g* (Oct. 14, 2015). Hittle merely offers conclusory and unsupported examples of circumstantial evidence of religious animus by Defendants.

Hittle alleges that on the day he received the notice of investigation from the City, he met with Deis, who angrily

threatened Hittle to accept a demotion or face a long, expensive legal battle in which Hittle's reputation would suffer irreparable harm.  Viewing Hittle's account of this meeting in the light most favorable to him still does not suggest any reasonable inference of religious animus, because there is no evidence in the record that Hittle's religion was discussed during this meeting.

Nor does the timing of Hittle being placed on administrative leave raise a showing of religious animus.  As noted above, Hittle was placed on leave on March 30, 2011, shortly after the City retained Largent to conduct the investigation.  Hittle claims that this decision was a result of an article published in a local newspaper on March 25, 2011, stating that Hittle had attended the Summit and noting its religious nature.  But at the time Hittle was placed on leave, he had already been on notice for almost five months that he was under investigation for actions relating to attending the Summit and other misconduct.  During this time, the record is replete with evidence that, despite knowledge of the City's impending investigation, Hittle continued to engage in conduct that was of serious concern to the City, including defending Union President Macedo's leak of confidential HIPAA data, refusing to discipline Duaime for improper overtime practices, and refusing to prepare a layoff plan or recommend staffing cuts for the Fire Department during the City's fiscal crisis, in spite of directives from Deis and Montes to do so—the latter two issues both memorialized in memoranda prepared by Hittle and sent to Montes on March 14, and 16, respectively.  In short, Hittle fails to raise specific or substantial facts regarding the timing of his being placed on administrative leave that reasonably link that event to the article noting Hittle's attendance at the Summit, let alone evidence of religious discrimination by Defendants.

Hittle also contends that certain findings in the Largent Report present evidence of pretext because the investigation deemed as "not sustained" certain instances of Hittle's misconduct alleged by the City. But the fact that the Largent Report sustained the findings relating to misconduct in attending the Summit but did not sustain the City's allegations as to a few of the investigation's numerous issues does not show that the other allegations were pretexts and the real reason was hostility to religion. Moreover, the Largent Report itself explains that issues deemed "not sustained" indicates that the "investigation disclose[d] that there was insufficient evidence to sustain the complaint *or* fully exonerate the employee" (emphasis added), as opposed to concluding that the issue was "unfounded" (meaning that the "investigation disclose[d] that the alleged act(s) did not occur or did not involve department personnel"), or "exonerat[ing]" Hittle on the issue (meaning that the "investigation disclose[d] that the alleged act occurred, but that the act was justified, lawful, and/or proper"). More significantly, Largent Report sustained what it characterized as the "most serious acts of misconduct" committed by Hittle, namely Hittle's inappropriate use of City time and a City vehicle to attend the Summit (which it characterized as a religious event) and Hittle's failure to disclose his personal relationships and corresponding financial interests with respect to George Liepart and Union President Macedo.

Simply put, the summary judgment record does not contain evidence to raise genuine issues of material fact sufficient for Hittle to meet his burden to demonstrate that Defendants' legitimate non-discriminatory reasons for firing him were mere pretext for religious discrimination. Even though the gravamen of Largent's Report and the notice terminating Hittle was the religious nature of the leadership

event, a nexus to a protected characteristic is not enough to preclude summary judgment for the employer. There is no genuine issue of material fact that Montes and Deis were motivated by religious hostility, as opposed to concern about the perception of others. And the facts that Hittle identifies as circumstantial evidence of discriminatory pretext are neither specific nor substantial enough to support a finding of unlawful employment discrimination.

**3**

As Defendants observe, in addition to Hittle's improper attendance at the Summit as one justification for removing him from City service, the City "articulated an overwhelming number of [other] non-discriminatory reasons for terminating Hittle's employment, which were independently verified by an outside investigator."

Hittle's *post hoc* effort to cast the findings of misconduct in the Largent Report as mere pretext for discriminatory termination is unsupported by the record. For example, Hittle claims that he had discussed his co-ownership of the vacation cabin with a City attorney, who advised him that he did not need to disclose it to the City. But the record is clear that Hittle did not inform Largent about this conversation during her investigation, and in his interview with Largent, nor did he do so when he and his attorney were given the opportunity at his pre-termination meeting on September 28, 2011. Hittle stated that he did not disclose to the City that he was a co-owner of the cabin, together with three other Fire Department officials, because he did not see a conflict of interest.

Nor does Hittle persuasively argue that the City's identification of his improper endorsement of Liepart's consulting business was pretextual. Hittle claims that the

City did not have a specific policy prohibiting such an endorsement, but Hittle told Largent in an interview that he understood it was City practice for its officials to not endorse private businesses. And, as Defendants observe in their brief, an employer does not need to identify a specific policy violation to fire an at-will employee. *See Guz*, 24 Cal. 4th at 351–53.

Hittle is no more successful in providing summary criticism of the allegations that he did not cooperate with the City during its financial crisis, promoted union interests at the expense of City welfare, and failed to discipline firefighters for misconduct. And, even viewing these facts in the light most favorable to Hittle, it is not sufficient for a plaintiff on summary judgment to merely "show the employer's [termination] decision was wrong, mistaken, or unwise." *Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011) (quoting *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000)).

Similarly, Hittle's challenging various findings in the Largent Report as "unfounded" (or downplaying their seriousness) is insufficient to raise a triable issue of fact as to pretext. In this respect, Hittle is simply offering his own subjective viewpoint as to his ability to effectively manage the Fire Department, but "an employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *accord Buhl v. Abbott Labs.*, 817 F. App'x 408, 410–11 (9th Cir. 2020) (memorandum disposition) (noting that "technical disagreements" with a manager and plaintiff's "own subjective belief that [his employer's] concerns about his performance were overblown are insufficient to raise a genuine issue of fact").

**4**

Because Hittle has not met his burden to overcome Defendants' motion for summary judgment on his affirmative discrimination claim, Hittle's claim for the City's failure to prevent discrimination in violation of Cal. Gov't Code § 12940(k) likewise fails.  There is no stated claim for failure to prevent discrimination if no discrimination occurred. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 288–89 (1998) (holding that the statutory language of § 12940 does not "support[] recovery on . . . a private right of action where there has been a specific factual finding that [the alleged] discrimination or harassment actually occurred at the plaintiffs's workplace").

## CONCLUSION

To summarize, we hold that, based on the record before us, the district court's granting of summary judgment in Defendants' favor was appropriate where Defendants' legitimate, non-discriminatory reasons for firing Hittle were, in sum, sufficient to rebut Hittle's evidence of discrimination, and Hittle has failed to persuasively argue that these non-discriminatory reasons were pretextual. When discriminatory remarks are merely quoting third parties and the real issue is public perception or other forms of misconduct (such as engaging in an activity that does not benefit the employer), there is no genuine issue of material fact that the employer was discriminatory.  For the foregoing reasons, the judgment of the district court is **AFFIRMED**.